

FILED

JUN 26 2012

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

**LAND AND MARINE REMEDIATION, INC.,**

       **Plaintiff,**

v.                               **Civil Action No. 2:11cv239**

**BASF CORPORATION,**

       **Defendant.**

## OPINION AND ORDER

This matter is before the Court on a motion for summary judgment filed by defendant BASF Corporation ("BASF" or "Defendant"). Such motion is opposed by plaintiff Land and Marine Remediation, Inc., ("LMR" or "Plaintiff"). LMR's primary contentions in opposition to summary judgment are that there are: (1) disputes as to material facts regarding alleged oral contracts, or course of dealing, that modified the written long-term leases at issue in this case; (2) disputes regarding whether BASF prematurely terminated such leases; and (3) disputes as to whether BASF acted in bad faith in exercising contractual discretion under such leases. The Court previously held a hearing on the pending motion and later ordered supplemental briefing on one issue. For the reasons stated herein, the Court **GRANTS**, in part, and **DENIES**, in part, BASF's summary judgment motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

It is undisputed that on August 12, 2008, LMR and BASF entered into an initial written agreement ("the Agreement") which provided that, following a due diligence period, the parties would enter into two separate long-term ground leases ("the Portsmouth Ground Leases") for parcels of real estate located in Portsmouth Virginia (collectively, "the Portsmouth Property"). Def. S.J. Brief, Undisp. Facts ¶ 3-4, ECF No. 33, and Agreement and Ground Leases, ECF Nos. 33-1, and 34-1 through 34-4. Pursuant to the Agreement and Ground Leases, LMR was required to dismantle several buildings and perform other work on the Portsmouth Property. ECF Nos. 33-1, and 34-1 through 34-4. In exchange, LMR would obtain leases to the properties for a minimum of four years, and a maximum of eighty-four years.[1] Pursuant to the Ground Leases, during the lease period, LMR was responsible for paying insurance premiums on the Portsmouth Property, paying property taxes, and paying utilities (hereinafter "carrying costs"). Additionally, with respect to one of the Ground Leases, LMR was required to maintain a storm water treatment system. ECF No. 34-2 ¶ 16.

In July of 2009, approximately one year after the Agreement was executed, the parties entered into an amendment to the

---

[1] It also appears that, pursuant to the Agreement, LMR was deeded several small "outparcels" in Portsmouth, Virginia. The outparcels, however, are not directly relevant to the Court's ruling herein.

Agreement and Ground Leases that extended LMR's deadline for dismantling buildings until December 31, 2009, extended LMR's deadline for removing debris until September 23, 2011, and made certain insurance requirements more stringent. ECF Nos. 33 ¶ 12, 34-5. Nothing in the written amendment altered LMR's obligation to pay all carrying costs as set forth in the Ground Leases.

Sometime in 2010, BASF began paying insurance premiums, property taxes, utilities, and other carrying costs that LMR was originally required to pay pursuant to the written Ground Leases. ECF No. 33 ¶¶ 14-21, ECF No. 39 ¶ 13. Additionally, it is undisputed that BASF took over the maintenance of the storm water treatment system at the Portsmouth Property notwithstanding the fact that one of the written Ground Leases required LMR to perform such function. ECF No. 33 ¶ 22, ECF No. 39 ¶ 14. LMR does not dispute the fact that it failed to comply with the Ground Leases as written. ECF No. 39 ¶ 13. However, LMR contends that through course of dealing and/or binding oral agreements, LMR was relieved of its obligation to strictly comply with the requirements of the Ground Leases with respect to carrying costs and maintenance of the storm water treatment system. ECF No. 39 ¶¶ 13-14. LMR further contends that several spreadsheets and emails create written evidence of BASF's agreement to pay such expenses until LMR subleased the

3

Portsmouth Property or received a cash-inflow from a separate BASF property located in Rensselaer, New York, such New York property being covered by a separate written contract.   ECF No. 39 ¶ 13.   LMR has not, however, advanced any evidence of a final written agreement to modify LMR's obligations to pay carrying costs on the Portsmouth Property nor evidence of a definitive agreement to afford LMR a specific "grace period" to repay BASF the arrearage under the Portsmouth Ground Leases.

It is undisputed that on November 24, 2010, LMR and BASF met in person, and BASF informed LMR, both orally and in writing, that LMR had breached the Ground Leases on the Portsmouth Property.   The written notice stated that BASF was terminating the Ground Leases effective twenty days from the date of the notice if the breaches were not remedied.   Although, as discussed below, LMR contends that such termination notice was ineffective because it was premature, it is undisputed that LMR never repaid BASF for the outstanding carrying costs incurred during 2010 on the Portsmouth Property.

LMR initiated this action in the Circuit Court for the City of Portsmouth, Virginia.   LMR's Complaint alleges that BASF breached the Ground Leases by wrongfully terminating LMR's tenancy, and alternatively asserts a ground for relief based on unjust enrichment.   Although LMR's Complaint only includes two separately labeled grounds for relief, within the breach of

4

contract claim LMR asserts that BASF breached an implied covenant of good faith and fair dealing.

On April 29, 2011, BASF removed this case from the Portsmouth Circuit Court to this Court. BASF filed an answer and counterclaim alleging that LMR had breached the Ground Leases by failing to timely pay the carrying costs thereunder and failing to maintain the storm water treatment system. Following discovery, BASF filed a motion for summary judgment on both LMR's claims and BASF's counterclaims. The summary judgment motion was fully briefed by the parties.

After carefully considering the parties' summary judgment briefs, the Court held oral argument on the pending motion. At such hearing, the Court heard extensively from counsel for both parties regarding the propriety of granting summary judgment. Furthermore, upon subsequent discovery of a relevant opinion issued by the Supreme Court of Virginia after briefing was complete, the Court afforded the parties the opportunity to submit a supplemental brief. Having received such supplemental briefs, this matter is ripe for decision.

## II. STANDARD OF REVIEW

Pursuant to the Federal Rules of Civil Procedure, a district court "shall grant" summary judgment in favor of a movant if such party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

5

matter of law." Fed. R. Civ. P. 56(a). The mere existence of some alleged factual dispute between the parties "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby Inc.</u>, 477 U.S. 242, 247-48 (1986). If the pleadings, affidavits, deposition transcripts, and other discovery materials demonstrate that there is no genuine dispute as to a material fact, "it is the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" <u>Hostettler v. Auto-Owners Ins. Co.</u>, 744 F. Supp. 2d 543, 545 (E.D. Va. 2010) (quoting <u>Drewitt v. Pratt</u>, 999 F.2d 774, 778-79 (4th Cir. 1993)).

Once the movant has properly filed evidence supporting summary judgment, the non-moving party may not rest upon the mere allegations of the pleadings, but instead must set forth specific facts in the form of exhibits and sworn affidavits illustrating a genuine issue for trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-24 (1986); <u>Cray Commc'ns, Inc. v. Novatel Computer Sys., Inc.</u>, 33 F.3d 390, 393-94 (4th Cir. 1994). At that point, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 249. In doing so, the judge must construe

the facts in the light most favorable to the non-moving party, and may not make credibility determinations. Id. at 255; Holland v. Wash. Homes, Inc., 487 F.3d 208, 213 (4th Cir. 2007). Although the evidence is construed in favor of the non-movant, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant].'" Drewitt, 999 F.2d at 778 (quoting Anderson, 477 U.S. at 252); see Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat" a properly supported summary judgment motion); Anderson, 477 U.S. at 249-50 (indicating that if the non-movant's evidence "is merely colorable, or is not significantly probative, summary judgment may be granted") (internal citations omitted).

### III. DISCUSSION

#### A.  Breach of Contract Claims

##### 1. Oral Contracts/Course of Dealing

LMR first argues that summary judgment is inappropriate on the parties' respective breach of contract claims because there are disputes as to material facts regarding whether BASF and LMR entered into oral contracts modifying LMR's contractual obligations under the Ground Leases and/or whether the parties' course of dealing modified or replaced the terms of the Ground

Leases.   In support of such contention, LMR argues that "'a contract in writing may be modified by a new oral contract'" and that it does not "'make any difference that the original contract provided that it should not be substantially varied except by writing.'"   ECF No. 39, at 10-11 (quoting Reid v. Boyle, 259 Va. 356, 369 (2000)).[2]  As noted by LMR, in Reid, the Supreme Court of Virginia further recognized that "contracting parties through course of dealing, may evince a mutual intent to modify the terms of their [written] contract." Reid, 259 Va. at 370.

LMR appears correct that even where, as here, a written contract expressly requires that all modifications be in writing, parties may generally later expressly agree orally, or implicitly agree through course of dealing, to suspend such written requirement. Id. at 369.  The Supreme Court of Virginia explained:

> We have held that a contract in writing may be modified by a new oral contract. In Zurich General Accident & Liability Ins. Co. v. Baum, 159 Va. 404, 409, 165 S.E. 518, 519 (1932), we stated:
>> "A contract in writing, but not required to be so by the statute of frauds, may be dissolved or varied by a new oral contract, which may or may not adopt as part of its terms some or all of the provisions of the original written contract . . . . Nor does it make any difference that the original written contract provided that it should not be substantially varied except by writing.

---

[2] It is undisputed that the Portsmouth Ground Leases are governed by Virginia law.

> This stipulation itself may be rescinded by parol
> and any oral variation of the writing which may
> be agreed upon and which is supported by a
> sufficient consideration is by necessary
> implication a rescission to that extent."

Id. at 369-70 (emphasis added). However, as emphasized in the above excerpt, such rule only applies where the Statute of Frauds does not require that the contract be in writing. Id. If, in contrast, the Statute of Frauds requires a writing, then any subsequent modification of such contract must likewise be in writing. See Lindsay v. McEnearney Assocs., 260 Va. 48, 53 (2000) ("[W]hen, as here, a contract is required to be in writing pursuant to [the Virginia Statute of Frauds], any modification to that contract must also be in writing and signed by the party to be charged or his agent."); Moyer v. Ellis, 167 Va. 213, 217-18 (1936) ("'It has long been settled in this State that a parol agreement materially varying a prior written agreement for the sale of land is within the statute of frauds. To allow such substitution of the verbal agreement for the written contract would defeat the very purpose of the statute.'"); Heth v. Wooldridge, 27 Va. (6 Rand.) 605, 610 (1828) (indicating that permitting material oral modifications of written contracts that are required to be in writing by the Statute of Frauds presents "the very mischiefs which the Statute meant to prevent"); Wooten v. Lightburn, No. 1:07cv52, 2008 WL 204482, at *9 (W.D. Va. Jan. 25, 2008) (unpublished) ("Under

9

Virginia law, when a contract is required to be in writing to be enforced pursuant to the statute of frauds, any modification to that contract also must be in writing and signed by the party to be charged or his agent to be enforced.").

Here, there appears to be no dispute that the Virginia Statute of Frauds requires the Ground Leases to be in writing as they represent a "contract for the . . . lease [of real estate] for more than a year." Va. Code. Ann. § 11-2. Accordingly, the principle set forth in Reid does not apply to the alleged oral agreements in this case because such modifications "must be in writing to satisfy Code § 11-2." Lindsay, 260 Va. at 53. Therefore, if, as contended by LMR, BASF orally agreed during 2010 to temporarily relieve LMR of the express contractual obligation to timely pay what appears to be hundreds of thousands of dollars in carrying costs, such material modification of the written Ground Leases was required to be in writing.[3] See ECF No. 34-2 ¶ 20.06 ("Failure of either party to

---

[3] LMR's contention that an LMR principal and BASF representative had a close personal relationship and often handled matters informally is inapposite. Controlling law mandates that multi-year land leases be in writing, and further mandates that modification of any such lease likewise be in writing. Additionally, the Portsmouth Ground Leases expressly required all amendments to be in writing, and in mid-2009, BASF and LMR executed a written modification to the Agreement and one of the Ground Leases, indicating that the parties understood the necessity to execute written modifications. Therefore, regardless of the existence of any friendship, LMR had no legal basis to believe that it was excused from multiple express financial obligations under the written long-term leases based on any informal oral discussions. LMR should have insisted that any contract modifications, particularly

insist upon the strict performance of any provision hereof or to exercise any option hereunder <u>shall not be deemed or construed to be a waiver of any breach or default</u> by such party under this Ground Lease.  No provision of this Ground Lease <u>shall be deemed or construed to have been waived by the Lessor or the Lessee unless such waiver shall be reduced to writing</u> and signed by the Lessor or the Lessee, as the case may be.") (emphasis added).

As in <u>Lindsay</u>, this Court also rejects LMR's additional contention that "the statute of frauds does not apply to [the alleged oral] agreement with [BASF] because the agreement has been fully performed." <u>Lindsay</u>, 260 Va. at 53.  The Portsmouth Ground Leases have "not been fully performed because, as [LMR has admitted], [it] failed to pay" the carrying costs expressly required by the written contracts. <u>Id.</u> at 53-54.  Similarly, LMR has failed to demonstrate that any alleged oral agreement was fully, or partially, performed.  "'Acts of part performance by the party seeking specific execution, to take a case out of the statute [of frauds], <u>must be of such an unequivocal nature as of themselves to be evidence of the existence of an [oral] agreement</u> . . . .'"  <u>Pair v. Rook</u>, 195 Va. 196, 206 (1953) (quoting <u>Hale v. Hale</u>, 90 Va. 728, 732 (1894)).  Stated differently, until the alleged acts of part performance "'of

_____

those purportedly modifying LMR's contractual duties, be put into written form and signed by BASF.

themselves imply the existence of some contract, parol evidence to show the terms of the contract relied on is inadmissible.'" Id. at 207 (quoting Hale, 90 Va. at 733). Here, LMR's purported evidence of part-performance of an alleged oral agreement is that, during 2010, BASF paid carrying costs on the Portsmouth Property. However, such action is plainly consistent with BASF's contention that it felt required to cover such expenses to ensure that liens were not placed on the Portsmouth Property, that insurance coverage did not lapse, and that utilities were not cut-off. Accordingly, "the alleged acts of part performance in the present case, taken singularly or collectively, do not" excuse the failure to execute a writing because they are not "demonstrative of, the existence of any [oral] contract between the parties; or, in other words, they do not unequivocally show that there was a[n] [oral] contract." Pair, 195 Va. at 207 (quoting Hale, 90 Va. at 733) (emphasis added); see T-- v. T--, 216 Va. 867, 872 (1976) ("[T]he part performance must be consistent with no theory other than the existence of the alleged oral contract.") (emphasis added).

The Court likewise rejects LMR's suggestion, advanced at oral argument, that BASF is "estopped from asserting the Statute of Frauds defense under the doctrine of equitable estoppel." Hanley v. Rummer, No. 1:11cv270, 2011 WL 4352402, at *3 (E.D. Va. Sept. 16, 2011) (unpublished). To establish equitable

estoppel, "the party seeking enforcement of a subsequent oral modification to a written agreement must show 'a representation, reliance, a change of position, and detriment.'" Id. at *3 (quoting T-- v. T--, 216 Va. at 872). Here, even if the Court assumes as true LMR's assertion that BASF orally promised to excuse LMR from its express contractual obligations on the Portsmouth Property, LMR has not presented any evidence demonstrating reliance, a change in position, or detriment.[4] In fact, LMR expressly asserts that "[b]y late 2009, demolition on the [Portsmouth] Property was complete," ECF No. 39-1 ¶ 18, yet by November 2010, nearly a year later, LMR had apparently failed to put such Property to any beneficial use. LMR's admission that work on the Portsmouth Property was complete in 2009 undermines any inference that BASF nefariously promised to pay carrying costs on the Portsmouth Property during 2010 in order

---

[4] LMR's counsel argued at the summary judgment hearing that, in reliance on BASF's oral promises to cover all carrying costs on the Portsmouth Property, LMR moved its resources to Rensselaer, New York to perform work for BASF pursuant to a separate written contract for similar demolition work. However, LMR has failed to point to any evidence supporting counsel's newly asserted claim that BASF made a representation that was relied on by LMR and caused a change of position. Furthermore, LMR has failed to present any evidence explaining any "detriment" that was suffered as to the Portsmouth Property. Stated differently, LMR has not presented any evidence suggesting that any of BASF's statements or actions had an impact on LMR's apparent failure to generate any cash flow with respect to the Portsmouth Property to cover the mounting costs for such Property.

to induce LMR to continue performing demolition and clean-up at the Portsmouth Property.[5]

Accordingly, LMR has not demonstrated a dispute as to a material fact regarding the existence of an enforceable oral or implied contract that would require resolution by a jury. Although LMR alternatively argued at the hearing on summary judgment that emails and other draft documents exchanged between the parties that reference LMR's cash-flow situation represent a binding written modification to the Ground Leases, the documents before the Court lack signatures, do not evidence a final agreement, and at best reflect negotiations about BASF continuing to excuse LMR's non-payment of carrying costs. Such documents therefore fall far short of constituting "'evidence on which the jury could reasonably find for the [non-movant].'" Drewitt, 999 F.2d at 778 (quoting Anderson, 477 U.S. at 252). Absent the existence of any enforceable modifications to the Ground Leases, the undisputed facts establish that LMR failed to comply with its contractual obligations, including failure to: (1) timely pay utility bills as required by the Ground Leases; (2) timely pay real estate taxes as required by the Ground

---

[5]  LMR likewise failed to present any evidence that LMR was capable of paying carrying costs on the Portsmouth Property but that it spent such money elsewhere in reliance on any statement or action by BASF. To the contrary, even viewing the evidence in a light most favorable to LMR suggests that LMR had cash-flow issues not only on the Portsmouth Property, but on several other projects covered by separate contracts with BASF.

leases; (3) adequately maintain the storm water treatment system on the Portsmouth Property and conduct water quality testing as required by one of the two Ground Leases; (4) timely pay a bill for grass cutting performed by the City of Portsmouth; and (5) timely pay the insurance premium for the Portsmouth Property.[6] As discussed below, BASF's remedies for such failures appear to turn on disputed facts associated with BASF's alleged failure to make demand for payment/repayment/performance under various contractual provisions.

### 2. Lack of Notice of Default

#### a. First to Breach Doctrine

BASF briefly asserts in its memorandum in support of summary judgment that even if BASF failed to comply with the notice/termination provisions in the Ground Leases, LMR is precluded from enforcing such contractual provisions because LMR was the first to materially breach the contract. See, e.g., Horton v. Horton, 254 Va. 111, 115-16 (1997). As indicated in

---

[6] LMR contends that a written and signed amendment to the Rensselaer ground lease implicates LMR's repayment obligation under the Portsmouth Ground Leases with respect to the insurance premium. However, even if the Court assumes as true LMR's contention that a portion of the $225,000 figure referenced in such writing pertains to insurance coverage for the Portsmouth Property, the language of such amendment does not appear to modify LMR's obligation to: (1) pay the insurance premium on the Portsmouth Property when due; or (2) reimburse BASF on demand after BASF made such payment. Stated differently, the fact that the writing appears to create an offset to a payment that may become due from BASF to LMR at a later date does not appear to alter LMR's contractual obligation to repay BASF for the Portsmouth insurance premium.

this Court's Order dated June 20, 2012, after the summary judgment briefing was complete, the Supreme Court of Virginia decided a case directly implicating the "first to breach" common law doctrine as applied in Virginia. Mathews v. PHH Mortg. Corp., 724 S.E.2d 196 (2012). Accordingly, this Court afforded the parties an opportunity to file supplemental briefs. After carefully considering the supplemental briefs and relevant case law, the Court concludes that BASF may not rely on the first to breach doctrine as a defense to LMR's allegation of non-compliance with the termination provisions of the Ground Leases.

It is well-established in Virginia that "a party who commits the first [material] breach of a contract is not entitled to enforce the contract." Horton v. Horton, 254 Va. 111, 115 (1997); see Countryside Orthopaedics, P.C. v. Peyton, 261 Va. 142, 154 (2001); Neely v. White, 177 Va. 358, 366 (1941). In 2008, in an opinion that failed to expressly discuss the first to breach rule by name, the Supreme Court of Virginia held that the plaintiff, a mortgagor who was "substantially in arrears" on mortgage payments, could still recover for the defendant's subsequent failure to comply with foreclosure provisions. Bayview Loan Servicing, LLC v. Simmons, 275 Va. 114, 117, 122 (2008) (emphasis added). In Mathews, another case involving a challenge to the defendant's failure to comply with foreclosure provisions, the Supreme Court of Virginia ruled

16

similarly to Bayview and did so after analyzing, at length, the first to breach rule.  Mathews, 724 S.E.2d at 199-200.  The court's analysis highlighted that a deed of trust, "by its nature" is a contract designed to protect both the borrower and the lender in the event of non-payment on the underlying mortgage note.  Id. At 200.  Accordingly, although non-payment is a material breach of the note, "non-payment of a note is not a material breach of a deed of trust within the meaning of Horton and Countryside Orthopaedics."  Id.

    Although Mathews confirms that the first to breach doctrine is alive and well in Virginia, such case does not present a clear directive as to how the Supreme Court of Virginia would resolve the instant dispute.  This Court agrees with BASF that the Ground Leases are markedly different from a deed of trust, as each Ground Lease is a single "contractual agreement[]" containing all of the rights and obligations of the parties."  ECF No. 59 at 9.  However, the lack of a separate and distinct contract is not necessarily dispositive, and the critical inquiry remains "the definition of material breach."  Mathews, 724 S.E.2d at 200.  As discussed below, although the Ground Leases do not by their nature permit LMR to enforce the notice and termination provisions notwithstanding its failure to make timely payments, by their terms, the Ground Leases permit precisely that.

Virginia adheres to a "plain meaning" interpretation of contracts and "no word or clause in [a] contract will be treated as meaningless if a reasonable meaning can be given to it . . . ." PMA Capital Ins. Co. v. US Airways, Inc., 271 Va. 352, 358 (2006). The Virginia Supreme Court is "committed to the view that parties may contract as they choose so long as what they agree to is not forbidden by law or against public policy." Chesapeake and Potomac Telephone Co. of Virginia v. Sisson and Ryan, Inc., 234 Va. 492, 503 (1987). BASF has not advanced, nor has this Court independently identified, any law or public policy reason that would preclude parties from expressly defining, in writing, such parties' rights and responsibilities in the event of non-performance even if such non-performance would otherwise constitute a material breach. See RW Power Partners, L.P. v. Virginia Elec. and Power Co., 899 F. Supp. 1490, 1495 (E.D. Va. 1995) (discussing Virginia's common law first to breach rule as stated in Neely, but recognizing the "equally significant rule," grounded in Virginia law regarding contract interpretation, that "the parties, by agreement, may abrogate such common law principles and, when that occurs, the courts must enforce the clear terms of the agreement"); see also Starr Elec. Co. v. Federal Ins. Co., 15 Va. Cir. 374, 377 (Va. Cir. Ct. 1989) ("Of course, freedom of contract principles,

18

permit parties to alter common law risk allocations by agreement.").

Returning to Mathews, Justice McClanahan's concurring opinion supports a finding that contracting parties are free to define their rights and obligations in the event of non-performance that would otherwise be considered a material breach. Independent from the majority's analysis, the concurrence recognizes that the first to breach doctrine has only been applied in Virginia as an affirmative defense when the breaching party (the first party) seeks damages based on the second party's "failure to perform one of [its] contractual obligations that was unrelated to any remedy of [the second party] for the [the first party's] breach of the parties' contract." Mathews, 724 S.E.2d at 208 (McClanahan, J.) (concurring) (emphasis added). Stated differently, the first to breach doctrine relieves the non-breaching party from further performance of its independent obligations, but does not relieve the non-breaching party from compliance with contractual provisions that expressly apply in the event of the other party's breach. Justice McClanahan's concurrence did not garner a majority of votes, perhaps because the majority's narrower holding, turning on the unique nature of a deed of trust, did not necessitate consideration of how to interpret notice/termination provisions in a single unified contract.

19

Regardless of the precise reason for its ruling, the majority opinion in Mathews does not appear to be a tacit rejection of Justice McClanahan's viewpoint.

Prior precedent from the Virginia Supreme Court arguably supports this Court's finding that contracting parties are free to include express notice/termination provisions in a contract, and that such provisions, which only apply in the event of a breach, remain enforceable in the face of a breach, regardless of its materiality, if such breach is expressly contemplated by the contractual provisions at issue. American Chlorophyll v. Schertz, 176 Va. 362 (1940). In American Chlorophyll, the licensing contract between the parties expressly required written notice of default, a 30-day cure period following such notice, and a second written notice terminating the contract if the defaulting party did not cure its breach. Id. at 367. The evidence demonstrated that defendant American Chlorophyll was the first to breach the contract by failing to pay plaintiff the royalties due under the contract. Id. However, the court held that the plaintiff's decision to continue earning royalties, even if payment was not being received, and his failure to invoke the express notice and termination provision was an "election," to allow the contractual relationship to continue in the face of the defendant's non-payment. Id. at 370. The court clarified that such election was not a waiver of the right to

20

recover the past due royalty payments, but that the election did preclude the plaintiff from abandoning his other contractual obligations (which included non-disclosure of the licensed processes). Id. at 371. Important here, however, is not the court's election of remedies analysis,[7] but the court's rejection of the plaintiff's assertion that the written notice and termination provisions in the contract were inoperable once defendant breached the contract. The Court explained:

> The only argument urged by complainant with reference to [the notice/termination provision] is that defendant may not complain of complainant's non-compliance with [such provisions] when he himself was in default. This is an obvious non sequitur, for by the terms of [such provisions] complainant's compliance or non-compliance could come only when defendant was in default. The default was a condition precedent to the operation of [such provisions], and if defendant's default should preclude its objecting to complainant's non-compliance, the section is a nullity. It is, by its very clear terms, however, not a nullity, but is one of the operative terms of the contract, and complainant's argument with reference to it must fall.

Id. Such analysis provides a persuasive, if not controlling, justification for rejecting BASF's assertion that LMR's breaches

---

[7] Another judge from this district recently opined that the election of remedies analysis in American Chlorophyll "cannot be harmonized with Countryside and Horton." Tandberg, Inc. v. Advanced Media Design, Inc., No. 1:09cv863, 2009 WL 4067717, at *3-4 (E.D. Va. Nov. 23, 2009). This Court does not directly consider whether it agrees that more recent Virginia Supreme Court cases tacitly overrule American Chlorophyll because the Court does not apply the election of remedies analysis therein, but instead, cites the case for its interpretation of the notice/termination provision.

excused BASF from compliance with the notice and termination provisions of the Ground Leases.

Although not applying Virginia law, a factually on point case from the Southern District of West Virginia squarely analyzes the application of the first to breach doctrine consistently with American Chlorophyll and this Court. Cabro Foods, Inc. v. Wells Fargo Armored Service Corp., 962 F. Supp. 75, 79 (S.D. W. Va. 1997). In Cabro Foods, the defendant armored car company allegedly failed to deliver the plaintiff's funds to a bank on two separate occasions occurring several months apart. Id. at 76. The contract between the parties expressly required plaintiff to provide: (1) immediate oral notice to the defendant upon discovery of any alleged loss; (2) written notice shortly thereafter; and (3) later written proof of such loss substantiated by records. Id. at 76-77. The plaintiff's failure to follow such provisions expressly relieved the defendant from any liability associated with an alleged loss and operated as a waiver of the right to claim lost funds. Id. at 77. The plaintiff, having failed to comply with such contractual provisions sought to invoke the first to breach doctrine, asserting that the defendant's failure to deliver the funds was a material breach thereby absolving Plaintiff from compliance with such contractual requirements. Id. at 78. The Court rejected such argument and granted summary judgment in

22

favor of the defendant based on the plaintiffs "fail[ure] to observe contractual conditions precedent to suit . . . ." Id. at 79. Explaining such result, the court adopted the defendant's analysis, stating:

> [I]n the case at bar the provisions that [Cabro] is attempting to avoid are not related to its duties of performance. [Cabro] is trying to use the "first to breach" argument not to assert that its contractual duties of performance were suspended, but to avoid portions [of] the contract unrelated to performance, namely, the conditions precedent to suit. This misconstrues the effect of the "first to breach" argument, stretching it far beyond a rule intended to protect one who is wronged by nonperformance from further exposure to injury.

Id.

Synthesizing the above, this Court finds that the "first to breach" rule does not absolve BASF from compliance with the express contractual provisions in the Ground Leases that by their terms only apply in the event of LMR's breach. The dispute in this case is unlike the case law relied on by BASF where, subsequent to a material breach, the non-breaching party was no longer required to perform its contractual duties unrelated to the express duties governing default/termination procedures. The contractual provisions at issue here are not illegal or against public policy, and it would be improper to read such clear "operative terms of the contract" as a nullity. American Chlorophyll, 176 Va. at 371. The Court need not resolve whether the Supreme Court of Virginia would conclude

that: (1) a breach governed by such contractual provisions
should, by virtue of the contract language, be deemed not
"material"; or (2) as suggested by Justice McClanahan, even if
deemed material, the first to breach rule does not operate to
absolve non-compliance with the notice/termination provisions of
the contract.[8] Regardless of which theory might be adopted, it
is apparent that such written contractual provisions are
enforceable, and thus, BASF's invocation of the first to breach
rule is rejected.

### b. Merits of LMR's Lack of Notice Claim

LMR contends that the Ground Leases' provisions governing
default contain ambiguities because they set forth two differing
time periods associated with default for failure to timely pay
carrying costs. LMR asserts that because such contracts were
drafted by BASF, any ambiguity should be construed in LMR's
favor. A careful review of the Ground Leases, however, reveals
the lack of any ambiguity with respect to the interplay of such
provisions. The first provision, defining default, expressly
sets forth two different occurrences that qualify as "events of
default." ECF No. 34-02 ¶ 14.01. Such contractual provision
states that LMR is in default based on: "Any failure by [LMR] to

---

[8] The second clause of ¶ 14.01 references a "material" failure to
comply with non-payment obligations in the Ground Leases, which
suggests that the default and termination provisions are intended to
apply even in the event of a "material" breach.

pay any rent or other amount to be paid by [LMR] hereunder when due, but in no event sooner than thirty (30) days after written notice thereof from [BASF] to [LMR]." Id. (emphasis added). Additionally, default occurs if LMR materially fails to meet its other obligations under the ground leases, "if such failure shall continue for sixty (60) days after written notice thereof to the Lessee." Id. (emphasis added).

The second contractual provision, governing termination, lists contractual remedies possessed by BASF "in the event of any default." Id. ¶ 14.02 (emphasis added). Thus, under ¶ 14.02, after LMR is in default, BASF has the right to terminate the Ground Leases and retake possession of the Portsmouth Property upon twenty (20) days written notice. Id. As paragraph 14.01 defines certain events of default, and paragraph 14.02 defines a remedy for such a default, the Court finds no internal inconsistency or the existence of an ambiguity.[9] However, notwithstanding the lack of ambiguity, as discussed below, summary judgment cannot be granted on this issue as there exist disputes to material facts.

---

[9] The Court recognizes that other contractual provisions require immediate payment by LMR of carrying costs without demand. Such provisions do not appear internally inconsistent with the default provisions as the question is not whether LMR was in violation of contract terms by being substantially in arrears on its obligations (it was), but rather, whether BASF improperly terminated the contracts before the right to terminate, as defined by the contract, ripened.

Here, as there was no enforceable oral modification to the Ground Leases, the undisputed facts establish that LMR was substantially in arrears on its payment obligations under the Ground Leases.  Based on such arrearage, BASF appears to have had ample justification for notifying LMR of its default and, if such default was not timely cured, pursuing termination of the Ground Leases.  However, BASF fails to demonstrate the absence of a dispute as to the material facts implicating whether BASF complied with the express provisions governing notice and termination of the Ground Leases.

It is "well established" that, under Virginia law, a "contract must be construed as written, without adding terms that were not included by the parties, and when the terms in a contract are clear and unambiguous, the contract must be construed according to its plain meaning."  Parikh v. Family Care Center, Inc., 273 Va. 284, 288 (2007); see Wood v. Symantec Corp., -- F. Supp. 2d. --,  2012 WL 368279, at *5  (E.D. Va. Feb. 2, 2012) (quoting Pacific Ins. Co. v. American Nat'l Fire Ins. Co., 148 F.3d 396, 405 (4th Cir. 1998)) ("'Virginia strictly adheres to the 'plain meaning' rule, entitling the parties to rely on the express terms of the written agreement.'").  "No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used

26

words needlessly." <u>PMA Capital Ins.</u>, 271 Va. at 358 (quoting <u>D.C. McClain, Inc. v. Arlington County</u>, 249 Va. 131, 135-36 (1995)).

Here, as discussed above, the contract terms expressly indicate that a failure to pay rent constitutes an "event of default[] . . . <u>no sooner than</u> thirty (30) days <u>after written notice</u> thereof from the Lessor to the Lessee" ¶ 14.01 (emphasis added).[10] The contracts further provide that "all notices . . . required under th[e] Ground Lease shall be in writing" and shall be hand delivered, mailed by certified or registered mail, or sent via nationally recognized air courier such as Federal Express. ¶ 20.01. Construing such language to have a reasonable meaning supports only one interpretation: failure to pay rent does not constitute an "event of default" absent "written notice thereof" from Lessor to Lessee. As the undisputed facts fail to establish that BASF satisfied such contractual notice requirements,[11] summary judgment must be

---

[10] Although nothing in ¶ 14.01 indicates that such paragraph provides the <u>exclusive</u> definition of a "default" under the Ground Leases, BASF's purported termination notice expressly invokes ¶ 14.01 and BASF has not presented undisputed facts indicating that a default <u>other than</u> that defined in ¶ 14.01 occurred in this case.

[11] For example, BASF states in its memo in support of summary judgment that "[i]n light of LMR's continued breaches of the Ground Leases, and <u>failure to pay on demand as additional rent the costs BASF incurred on LMR's behalf</u>, BASF made the decision to terminate the Ground Leases pursuant to paragraph 14.02." ECF No. 33 at 14. However, BASF fails to advance evidence demonstrating that "demand" was ever made.

denied as to LMR's breach of contract claim, and BASF's breach of contract counterclaim, to the extent they are impacted by BASF's alleged failure to send written notice to LMR seeking payment for carrying costs, or seeking cure of LMR's failure to maintain the storm water treatment system, in compliance with ¶ 14.01.    See, e.g., American Chlorophyll, 176 Va. at 370 (interpreting somewhat similar contract language as follows: "the parties specifically contracted that no breach should be grounds for terminating the contract unless two notices were given, the first stating that a breach had occurred, and the second that the thirty-day 'period of grace' had expired and the contract was henceforth at an end").

The Court rejects BASF's suggestion that there is no dispute as to a material fact because "the purpose" of both paragraphs 14.01 and 14.02 is to "give LMR the opportunity to cure its defaults," and LMR has, to date, failed to cure.    BASF cites no case law in support of its argument that, even if BASF failed to comply with the termination provisions of the contract, such failure is somehow excused by LMR's failure to cure the alleged default after the contract was purportedly terminated by BASF.

In sum, the Court finds that BASF's summary judgment motion must be denied with respect to LMR's breach of contract claim, and BASF's breach of contract counterclaim, because such claims

28

are necessarily impacted by the timing/manner in which BASF purportedly terminated the Ground Leases.   Although there is no remaining factual or legal dispute that LMR was substantially in arrears on its payment obligations, BASF has not demonstrated that BASF provided "written notice" of an amount due or past due, prior to November 24, 2010.[12]   The Court therefore cannot resolve either parties' breach of contract claim at this stage.[13]

### 3. Good Faith and Fair Dealing

The United States Court of Appeals for the Fourth Circuit has recognized that contracts governed by Virginia law generally contain an implied covenant of good faith and fair dealing. Va. Vermiculite, Ltd. v. W.R. Grace & Co., 156 F.3d 535, 541–42 (4th Cir. 1998); see SunTrust Mortg., Inc. v. United Guar. Residential Ins. Co. of North Carolina, 806 F. Supp. 2d 872,

---

[12] Although BASF has provided some evidence suggesting that LMR had in its possession past due tax and utility bills in September of 2010, it is unclear whether "written notice thereof" was made by BASF to LMR as required by ¶ 14.01 of the contracts.   Second, even were this Court to assume that BASF forwarded such bills to LMR with a written notice requiring payment, BASF fails to set forth undisputed facts that demonstrate which of the two Portsmouth Ground Leases was breached by each alleged failure to pay.

[13] At trial, the Court will resolve disputes regarding the admissibility of evidence associated with the parties' separate and distinct contract governing the BASF property in Rensselaer, New York. As indicated in a prior footnote, the Court finds that nothing in such writing acts to relieve LMR of its legal obligation to pay, upon demand, the Portsmouth portion of the insurance bill.   Accordingly, the relevancy/admissibility of such document remains questionable. However, this Court will address such matter at trial because the parties' voluntary decision to intertwine obligations created under separate contracts may open the door to the limited admissibility of some evidence associated with the Rensselaer ground lease.

893-95 (E.D. Va. 2011) (examining at length how state and federal courts in Virginia have acknowledged an implied duty of good faith and fair dealing in contractual relationships, and finding no reason to differentiate between contracts falling under the Uniform Commercial Code ("U.C.C.") and the common law); Charles E. Brauer Co. v. NationsBank of Va., N.A., 251 Va. 28, 33 (1996) (indicating that under Virginia law, breach of the U.C.C. implied covenant of good faith and fair dealing gives rise to a cause of action for breach of contract and is not an independent tort). However, it is well-established that "when parties to a contract create valid and binding rights, an implied covenant of good faith and fair dealing is inapplicable to those rights." Ward's Equip. v. New Holland N. Am., 254 Va. 379, 385 (1997) (emphasis added). As explained by the Fourth Circuit, "although the duty of good faith [under Virginia law] does not prevent a party from exercising its explicit contractual rights, a party may not exercise contractual discretion in bad faith, even when such discretion is vested solely in that party." Vermiculite, 156 F.3d at 542 (emphasis added). Here, the parties do not dispute the applicability of the above legal standard; rather, they dispute whether BASF's decision to demand payment of past due obligations and attempt to terminate the Portsmouth Ground Leases was the exercise of a contractual right, or the exercise of contractual discretion.

LMR's assertions that BASF breached the implied covenant of good faith and fair dealing by first tolerating non-payment of obligations under the Portsmouth Ground Leases, but later demanding compliance with such obligations, fails as a matter of law. The undisputed evidence demonstrates that LMR failed to satisfy its contractual obligations. BASF had the express contractual right to demand repayment after LMR fell into arrears, and LMR has failed to point to any "discretion" under the Portsmouth Ground Leases that BASF exercised in bad faith.

As noted above, "the duty of good faith [under Virginia law] does not prevent a party from exercising its explicit contractual rights," Vermiculite, 156 F.3d at 542, and BASF clearly had the express contractual right to require that LMR cure its arrearage under the Portsmouth Ground Leases. LMR nevertheless suggests that because BASF "chose" to exercise such right at a suspicious time, LMR has asserted a valid claim for breach of an implied covenant of good faith and fair dealing. However, BASF's decision to invoke its contractual rights to repayment does not somehow transform such express rights into discretionary rights. Such point is illustrated by the detailed analysis in In re Buffalo Coal Co., Case No. 06-366, 2010 WL 724702, at *4 (Bankr. N.D. W. Va. 2010). There, a power company purchasing coal from a coal supplier exercised its contractual option to terminate a written coal supply contract based on the

31

coal supplier's insolvency.   Id. at *1.   The power company's termination was based on "an express provision allowing [it] to terminate the agreement if [the supplier] became subject to a 'Bankruptcy Proceeding,'" which was defined by contract to include insolvency.   Id. at *2.   In rejecting the supplier's assertion that the implied covenant of good faith and fair dealing was applicable, the bankruptcy court's opinion explained:

> Of course, [under Virginia law,] just because a party has a right to act under a contract based on the other party's non-performance does not mean that the party is obligated to undertake that act. Rights and obligations are different. Rights in favor of a non-breaching party are generally subject to waiver, and deciding whether to waive a right necessarily entails an act of discretion. For example, in Mahoney [v. NationsBank, 249 Va. 216 (1995)], the bank could have agreed to partially release its lien based on the offered sale prices for individual parcels of property, but chose not to. In Charles E. Brauer Co., the bank had the discretion to approve a foreclosure sale but opted to reduce its claim to judgment instead. In neither Mahoney nor Charles E. Brauer Co., did the court find the non-breaching party's decision to act in the manner chosen to be subject to a duty of good faith. Indeed, a finding that every decision to exercise a contractual right is imbued with an act of discretion that must be exercised in good faith would wholly eviscerate the holdings of cases like Mahoney and Charles E. Brauer Co., that a party cannot act in bad faith by acting pursuant to an express contractual right.

Id. at *4.

As suggested in Buffalo Coal, if exercising an express contractual right to demand payment or an express contractual

right to issue a notice of default were permitted to be recast as a "discretionary" decision merely because the non-breaching party could opt <u>not</u> to exercise such express right, <u>every</u> contractual right would be subject to being recast as "discretionary." Cases applying Virginia law simply do not support an attempt to recast the invocation of express contractual rights as a discretionary act. <u>See</u>, <u>e.g.</u>, <u>Skillstorm Inc. v. Elec. Data Sys.</u>, 666 F. Supp. 2d 610 (E.D. Va. 2009) (rejecting the assertion that the duty of good faith and fair dealing applied to the defendant's express right to terminate purchase orders even though the contractual language at issue stated that the defendant "<u>may</u> terminate this Purchase Order, or any portion thereof, for any reason without penalty upon written notice to Subcontractor") (emphasis added); <u>Buffalo Coal</u>, 2010 WL 724702, at *4 (indicating that a contracting party's "choice to exercise its contractual termination right cannot be altered by enervating the exercise of that right with a duty of good faith").

This Court recognizes no legally significant difference between the contract language at issue in this case, which expressly grants BASF the right to seek repayment, and ultimately termination, if LMR fails to satisfy its contractual duties to pay carrying costs, and language permitting termination on the other party's insolvency or language

33

permitting termination "at will."  See Buffalo Coal, 2010 WL
724702, at *4 (finding that although the power company "did not
have to act in the manner [it] did . . . [but] made the
conscious choice to do so," like the non-breaching parties in
Mahoney, and Charles E. Brauer Co., such choice remained a
contractual right, not an exercise of contractual discretion);
Omega World Travel, Inc. v. Trans World Airlines, 111 F.3d 14,
16 (4th Cir. 1997) (indicating that because the parties "bound
themselves contractually to an 'at will' relationship," Virginia
law did not impose "an implied duty of good faith and fair
dealing [to] override [such] explicit contract terms").  The
Court therefore finds that because the Portsmouth Ground Leases
give BASF the express contractual right to seek repayment, and
ultimately seek termination, if LMR fails to perform its
contractual duties, LMR cannot assert a cause of action grounded
in the doctrine of good faith and fair dealing.  BASF's summary
judgment motion is thus granted as to LMR's assertion of a
violation of the implied duty of good faith and fair dealing.[14]

---

[14] To the extent it requires separate analysis, the Court rejects LMR's
assertion that BASF acted in bad faith by rejecting LMR's proposed
sublessee under the Rensselaer ground lease.  Such contract is not
before the Court, and BASF's alleged bad faith acts of rejecting the
sublessee and cancelling the Rensselaer ground lease suspiciously
close to LMR's completion of work under such separate contract are a
matter for another day, before another judge, sitting in another
court.  LMR cannot bootstrap the alleged bad faith exercise of
discretion under a separate contract, creating separate obligations,
into a violation of alleged contractual discretion purportedly created
under the Portsmouth Ground Leases.

## 4. Agency

LMR alternatively argues that summary judgment should be denied because BASF was acting as LMR's "agent" for the purposes of paying carrying costs and maintaining the storm water treatment system. Such alternative legal theory, not mentioned in the Complaint and apparently raised for the first time in defense to summary judgment, fails on its face. LMR fails to set forth any facts that could support the finding that BASF was LMR's agent as there is no evidence, or inference, that BASF was under LMR's control or acting for the benefit of LMR. See Narayanswarup, Inc. v. Doswell Hospitality, LLC, 80 Va. Cir. 650, 652 (Va. Cir. Ct. 2010) (citing Whitfield v. Whittaker Memorial Hospital, 210 Va, 176, 181 (1969)) ("Under Virginia law, two factors must be present for an agency relationship to be established. First, the agent must be subject to the principal's control with regard to the work to be done and the manner of performing it. Second, the work has to be done on the business of the principal or for the benefit of the principal."). Rather, the undisputed facts clearly demonstrate that BASF was the business entity on the other side of the negotiating table in this arm's length business relationship. See Village Motors, Inc. v. American Federal Sav. and Loan Ass'n, 231 Va. 408, 412 (1986) ("Clearly, [appellee] who was negotiating at arms length with [appellant], is not deemed to

35

have been the agent of [appellant] for the purpose of procuring the bank check."). LMR's agency argument, even if timely asserted, fails on its face.

## B. Unjust Enrichment

LMR's Complaint includes a ground for relief based on unjust enrichment. BASF's summary judgment motion notes that the undisputed facts establish that the parties entered into a valid written contract that governs the legal rights of both LMR and BASF. LMR does not dispute such fact nor does it argue in its brief in opposition that summary judgment should not be granted in favor of BASF on LMR's unjust enrichment claim. The Court therefore grants BASF's unopposed request. See Acorn Structures, Inc. v. Swantz, 846 F.2d 923, 926 (4th Cir. 1988); Royer v. Board of County Sup'rs of Albemarle County, 176 Va. 268, 280, 10 S.E.2d 876, 881 (Va.1940) ("[W]here there is an express and enforceable contract in existence which governs the rights of the parties, the law will not imply a contract in contravention thereof.").

## IV. CONCLUSION

For the reasons set forth above, BASF's summary judgment motion is **GRANTED** with respect to LMR's purported cause of action under the implied covenant of good faith and fair dealing and LMR's unjust enrichment claim. Furthermore, BASF's summary motion is **GRANTED** with respect to BASF's breach of

contract claim to the extent that BASF contends that LMR is legally obligated under the written Portsmouth Ground Leases to pay carrying costs and maintain the storm water treatment system.  The pending motion is **DENIED** with respect to LMR's breach of contract claim asserting that BASF failed to comply with the notice/termination provisions in the Ground Leases, and **DENIED** to the extent that BASF's breach of contract claim is impacted by BASF's alleged failure to comply with the written notice/termination provisions.

The Clerk is **DIRECTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

                                              /s/

                                        _____
                                            Mark S. Davis
                                   UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
June 26 , 2012